Good morning, Your Honors. This case presents important issues on which the law overwhelmingly favors Ochoa Keys, leaving no question that he clearly invoked his right to silence during interrogation, that Ochoa Keys is not guilty of any of the crimes he has committed, and that Ochoa Keys is not guilty of any of the crimes he has committed. that prejudicial statements made by the police during that interrogation should have been redacted and were made worse without eliminating instruction, and that Keys should have only received one conviction each for concealing a homicidal death and dismembering a human body. Within the issues raised in the brief, I have discussed other crimes evidence as well. That's relatively straightforward, so I rest on the briefs on that issue. Otherwise, I intend to discuss all of the issues in the order they were presented in the brief. First, Keys clearly and unambiguously invoked his right to silence when the police told him it was very clear that he had caused the disappearance of Barbara Rose, and he said, I didn't do anything. Period. Point Blake. If that's the case, if you feel like based off your investigation, then do what you gotta do. There ain't nothing further for us to talk about. The standard to invoke the right to silence is deliberately not demanding. A defendant need only be clear enough that a reasonable officer would understand he wants to stop talking to the police. In this case, Keys was so clear, as evidenced by the fact that the police stopped the interrogation five minutes later. What he said was, he had not – I made my statement, I did not do anything. Period. And since the police believed otherwise, he had nothing further to say. This is similar to two cases I'd like to highlight that we've pointed out in the brief. One is the federal case, People v. Lam Qua Cong, where the defendant similarly maintained his innocence and then said, if you already got everything, don't need nothing to talk about. There is some grammar stuff because he was from another country. And in another similar case in Illinois, People v. Cox, the defendant said, I don't want to answer no questions because I can't help you, and I don't want to dig myself into a hole. These cases recognize that just because a defendant gives a why for his invocation, which is what Keys did here, you believe I'm guilty, that doesn't mean that his invocation is any less clear. In fact, there's one case we cited in the brief, McGraw-McCollin, that says when you give a why, it makes your case even more clear, the invocation. And that is exactly what Keys did here. In fact, he confirmed his stance repeatedly throughout the minutes that followed where the police tried to give him other reasons why he should talk to them. They say he's going to want to make a statement later, but now's the time to talk. They are willing to listen right now if he has anything he wants or needs to say. They also say, okay, but we're not going to beg you if you're sticking with your story. It is what it is. In response to all of that, Keys says that he understands now's the time to talk, he has nothing he needs or wants to say, and it's fair enough that he's sticking with the story that he gave. What happened in this case was then the police stepped out of the room and they came back a couple hours later and just started talking without giving them Miranda rights? Yeah, it was a little more than an hour, just to be totally accurate on that, but yes, they come back in and they throw some photos in front of them and say, who is this right here? And the state does not dispute that they feel just frivolously under the invocation if there was an invocation, so there's no dispute as to that point. And because of that, and especially since the officers had left the room confirming they understood it invoked, it wasn't effective for defense counsel not to move to suppress the point of Keys' interrogation and everything onward from that point. Counsel did not move to suppress the statements, right? That's why we're here and an effective assistance of counsel. What statements, what were the statements that were introduced at trial from the defendant? From the point after the interrogation or just in general? At trial. At trial, okay. So they introduced, first there's a statement that he makes on a different day when he's not a suspect at that time. That comes introduced and that gives his explanation for what's been happening, why the last time he saw Rose, etc. He does that again in the second interrogation and that comes in before the invocation. There's some other stuff, he gives consent to search, some other kind of stuff. After the invocation comes, it's mostly just his denials of guilt and the police confronting him with reasons on why he should confess. But what does come out is the police opinions on their, like what they believe the evidence shows. His denials of accidents come out after that. He identifies himself in some photos and then there's some discussion about like there's some wet carpet missing in the bedroom and they talk to him about potentially borrowing a truck. So mostly after the interrogation, it's the inference of what he does not say that the state used, the state uses. Does that answer your question? Most of it is a statement that was a denial. Correct. Yes. So what would have been suppressed? What statement would have been suppressed? So it would be the entire interrogation video itself. Because the state did rely in closing on saying, they say for example, what do you expect a defendant who denied, who is guilty would do? And they say you'd expect him to deny that, right? Here's the actual quote. Also take into consideration the defendant's statements took these and what you would expect his story to be if he committed this. You would expect him to deny that, right? That's exactly what he does. So they rely on his denials as proof to his guilt. Just real quick. You're saying here that the impact of the failure to move to suppress the statement is that the defendant's statement denying the crime was admitted as evidence. Is that correct? Correct. And the state uses that against him. They also use the fact that he doesn't say it was an accident at that point against him as well. It's almost like impeachment by omission. Have you testified? Have you not testified? But that's basically how it comes in. They also refer the jury to talk about you saw the change in the officer's tones from the first and second interview. You can see that they treated him as a suspect at this point. So they're just relying on everything that happens there. And it was very prejudicial to Keyes because they were hearing all of these statements from police that we know you did this. Sorry, if you're not sure, I have another question. Could it be trial strategy for counsel to assess the evidence, assess that most likely his client was not going to testify, and to make a determination that this is a way to introduce before the jury his client's denial? They already had several denials before the invocation. And, of course, there was also what came in after the interrogation, a little bit before that they talk about that Nick Patton had made this statement. And we know that during the closing argument she said, there's Nick Patton. She tried to distance herself from Nick Patton and said, was that just an interrogation tactic, something like that. She also said after trial her strategy had been that Keyes didn't do this. So in the interrogation there are, and I can quote, there's at least five instances where the police say something like this. We've concluded our investigation up to this point, and it's very clear that you caused the disappearance of Barbara, okay? We're past the point of this should happen. There ain't no denying it. You can sit there and say that, but it happened. So all of these statements came in in addition to them talking about me. So it's the police statements they're concerned about, not the defendant's statements. Correct, yes, correct, Your Honor. I mean, it's sort of a combination of both, but yes. And the police statements are why we separately said that even if the statement comes in, she should have redacted those if there's any benefit at all. So that you're hearing the denials. Certainly, all of these instances where the police say, we know you did it, where they talk about an out-of-court witness who didn't testify, you confess to him. They even say at the end, okay, well, Nick might believe that you didn't do this, or Nick might believe that this was an accident, but you sitting here not telling us that proves that you were a cold-blooded killer and did this intentionally. So everything that came in went totally against defense counsel's strategy at trial. And counsel, what standards should we be looking at to determine whether or not those police statements should have been redacted? I believe the standards should be they can only come in when they are necessary to contextualize a relevant answer from the defendant. And that's not what the appellate court held, correct? The appellate court said they were helpful to contextualize his silence and his kind of just everything. And we have cited a number of cases inside and outside of Illinois, an overwhelming amount that all use this necessary standard. So we believe that is the case. And I would just say, if you want to look at the difference between helpful and necessary, helpful is very vague. It could be something as, not to try to make too light of a situation, but had I slept eight hours last night, I would be more rested today. I slept five or six. Was that necessary for me to come in here? No. But it was helpful. So it's just very easy for a judge to have, a trial judge looking at this, to have a standard. What do I do? Is it necessary to contextualize versus this vague helpfulness? Especially since we're dealing with interrogation statements where police are permitted to lie during interrogations. There's nothing wrong with that. So when you're doing something like that, you do need to have a high standard of what can come in. They have to be necessary to contextualize an actual statement from the defendant. And is there, should we, there's talked about in the briefs whether or not we should have a limiting instruction? I mean, so you're saying the standard should be necessary and a limiting instruction or one or the other? Both, Your Honor. The standard should be necessary and absolutely there should be a limiting instruction. That is confirmed from an overwhelming amount of authority of case law that we've cited from outside of Illinois. And, of course, Jones on evidence says when this comes in, counsel should first object. If the objection is overruled, you have to get a limiting instruction. And that should come in both before the interrogation is played so the jury is made aware from the get-go. They should not assume anything the officers say is truthful, and it should come in at the end. So that's the language you're suggesting? The jury should not consider anything stated by the officers on this video as truthful or that's the language? I can get, like, an example of a case that has said that. So, yeah, there's some of the cases that we've cited. There's one from a federal court. They basically all say the same thing, that you should not assume the officers' statements were true and they are relevant only for the limited purpose of providing context to the defendant's answers. So that would be what we made here, which is another point I would like to make to Justice, in response to Justice Tice's question about does defense counsel want some of this stuff in. There is, if we go back to that, this is just there's so many layers of ineffectiveness here. Even if, and I don't think she does want that. I think it was a terrible decision. No reasonably competent attorney would allow statements to come in of the police saying everything we know before proves you're guilty, everything we know after talking to you proves you did it in cold blood. But if for some reason she can't get that out or she has any sort of strategy, you absolutely have to get this instruction. And both IPI 1.01 and Illinois Rule of Evidence 105 require that when there is evidence offered for a limited purpose, you have to have some sort of instruction informing the jury of that. So it absolutely had to come in here. The only issue is exactly how it would have looked. And to that end, as your Honor asked, that's how we would say it should look. Was the evidence in this case overwhelming against your client? No, it certainly wasn't. And I think there's two issues to look at here. One is did they prove intentional murder? That's the big question. Second, did they prove that Keyes was involved in Rose's disappearance at all? And on both of those questions, the evidence was not overwhelming. On the first question was did the state prove intentional murder? The evidence didn't even come close to be overwhelming. The only direct evidence came from the state's witness, Carol Hamilton, who says Keyes told him that Rose died when they were joking around. She had pulled out a gun, which he revealed to be a starter pistol. He pulled out his own gun. Her starter pistol goes off. The next thing Keyes knows, she's bleeding. There's other evidence to corroborate that there – or I should say there's further evidence to undermine a lack of intentional proof. First, the fact that Keyes took action so frantically after this event to cover it up suggests he hadn't planned it beforehand. But doesn't that also work against him? I mean, if it's an accident, a reasonable person might call the police or call for help, but you wouldn't dismember the body and on different occasions hide it in your mom's trunk and do other things to and with the body? Well, he does say that he – Hamilton says that Keyes contemplated calling police, and he did call for help in the form, if you believe Hamilton, of his cousin. He called Nick Patton, and according to Hamilton, it was Nick Patton who suggested they take this stuff. But then I also would say if you're looking at all the actions to cover up the fact to prove intentional murder, then that would make Nick Patton guilty because he's clearly on video committing these acts with Keyes as well. So in the end, it's Carroll Hamilton's testimony that links Keyes to this offense. And as the state conceded at trial, he was not a – there were issues with his testimony. The jury should view his testimony with caution. He did get a deal both to get out of jail in exchange for his statement and then a second deal to testify against Keyes to get a burglary conviction reduced or to be sentenced on that to three years when he was facing 30. So there was a lot of problems with his testimony. And so when you have these two issues, did Keyes do this at all and did the state prove it was intentional, there's a lot of room for the jury to kind of debate that stuff, and it certainly wasn't overwhelming. But when you're hearing that— But what about there was the video of them at the gas station or whatever, I mean, together buying the necessary supplies for what was done to the victim's body? We don't concede that the evidence was sufficient to – we concede the evidence was sufficient to show the action of dismemberment and concealment. I would just say that doesn't prove – first of all, since Nick was involved in that too, it doesn't necessarily prove Nick over – prove Keyes over Nick. And then at the end, it definitely doesn't prove intentional murder. And when you have police statements coming in as substantive evidence, we've already concluded our investigation. It's very clear you're responsible for Rosa's disappearance. You not admitting this to us and saying it was an accident proves you did it intentionally. Nick called us and told us you confessed to him. The jury would have to rely on that. And there's, in fact, strong evidence it did, since without very much direct evidence, without any direct evidence that it was intentional, they found intentional murder. As the amicus brief points out, jurors rely heavily on statements of police officers. They carry an aura of reliability. So that's why prejudice is undermined as a result. I would like to talk about our final issue, but does this court have any more questions on our first two issues? Okay. With respect to the final issue, the law overwhelmingly shows that only one conviction for concealing a homicidal death and one conviction for dismembering a human body can stand. The plain language, first looking at the concealment statute, there can be just no dispute that it only allows for one conviction for concealing of the same death. The legislature specifically amended the statute in 2010 to define conceal as the performing of some act or acts for the purpose of preventing or delaying the discovery of a death by homicidal means. So the legislature went out of its way to say conceal means an or some acts to conceal a death. The dismembering a human body statute, on the other hand, does not specifically define the unit of prosecution. It only talks about the acts that constitute the offense. But under this court's clear case law that has been well established for decades, when a statute is silent on an issue, you construe it in the defendant's favor. And construing, that's a rule of limity. Construing it in his favor means one body, one crime of dismemberment. The state largely does not dispute the textual plain language analysis. They say that everything hinges on whether this was part of one course of conduct or more courses of conduct. With respect to the concealment statute, that just can't work. The legislature went out of its way to make clear that any act taken to cover up a homicidal death is one crime. So that doesn't work there, and it shouldn't work with a dismemberment statute given the rule of limity. We can't read words into the statute to construe it against the defendant. But let's say it does hinge on course of conduct. Then the result should be the same. First of all, when the state filed a motion, when the state tried this case before the jury, it filed a motion before trial to join all of the charges in this case, murder, concealment, dismemberment, in one charge, one trial, because it said that all the acts were part of the same comprehensive transaction. One comprehensive transaction is one course of conduct. Also, it's too late at this point to look at this. The state itself goes into this factual analysis to see if there is a course of conduct. But that had to be shown to the jury as the trier of fact. It wasn't. So with the first time on appeal, we can't suddenly say it was a separate course of conduct. And finally, I would say even if it wasn't too late, the factors that the state cites from Stinkowitz are incorrect. Stinkowitz says specifically those factors determine if two convictions based on a different act occurred. So if we are looking at factors to assess whether a different act occurred to establish course of conduct, and course of conduct is what constitutes the unit of prosecution of a statute, we no longer have any unit of prosecution analysis in Illinois. Rather, the test should be what this court has said in Bell is an unrelated course of conduct, which is was there substantial change in the nature of the defendant's criminal objective? So it doesn't matter if it happened over a course of days? If it happened over a course of days. If it was all related to one course of conduct, yes. I'm sorry. If it was all related to the same, dismembering the same body and concealing the same death, I would say yes. It doesn't matter. And I would say even if it happened over the course of years, frankly, under the plain language of the statute, certainly for concealment, because the legislature has said that. Concealment and dismembering are two separate offenses. Yes. And then I would say the nature of Key's objective never changed. It was all to conceal and cover up and prevent or delay the discovery of Rose's death. The nature of his objective never changed. So whether you're looking at the plain language of both statutes, applying the rule of limity, or applying this course of conduct test properly and remembering that it was never submitted to the jury, it leads to the same result. Does this court have any questions at all? Thank you very much. I'll step away. Thank you, Your Honor. And may it please the court, I'm Assistant Attorney General Eric Levin. On behalf of the people of the state of Illinois, like my friend on the other side, I will start as well with the ineffective assistance claim, but I'm happy to take questions on any of the issues presented at any time. And I think on the ineffective assistance claim, it's important to take a step back and realize that this is an ineffective assistance of counsel claim, which means the question here is not whether there was a meritorious Miranda argument to be made here. The question is not whether there was a meritorious argument to be made that certain statements by the detectives were inadmissible or that a limiting instruction was warranted. The question under Strickland, Strickland v. Washington, as the U.S. Supreme Court explained in Primo v. Moore, is whether no competent attorney would have pursued those arguments. In other words, was counsel's decision to forego those arguments objectively unreasonable? Did she make errors so serious that she was not functioning as the counsel guaranteed by the Sixth Amendment? Even if the defendant could make that showing, Strickland also requires a showing that there is a reasonable probability that if counsel had made the arguments he now says she should have, there is a reasonable probability that he would have been acquitted or that the jury would not have convicted him. Padilla v. Kentucky, another United States Supreme Court case, explains that this is a very high bar to beat, and it's not easy to surmount that high hurdle, and the defendant has not done so here. Because he has to make both of these showings, the court can resolve this claim on either ground. It needn't address both, and Strickland self-recognizes that it will often be easier to resolve ineffective assistance claims on the prejudice prong. So I'll start there, because I think the evidence here is overwhelming. Even if we were to throw out everything from the videos that the defendant now objects to, there is no reasonable probability that this jury would have found that he did not intentionally murder Barbara Rose. The very first piece of evidence I would cite is he confessed to murdering Barbara Rose to Carol Hamilton. Yes, a jailhouse informant, don't dispute that, but also a friend of the defendant, somebody who had lived with the defendant for a short period of time, which provides, you can be confident that it's not unusual that the defendant would have confided in him. And as we argued at trial, almost everything that Hamilton recounted defendant as having said was corroborated by independent evidence. Hamilton talks about the defendant saying Rose was shot in the face. That's what the medical examiner testified to. Hamilton mentions the defendant saying that he wrapped the body in a comforter. There was a comforter found in the garbage bag where Barbara Rose's charred and dismembered remains were found. In a bag I would note that had the defendant's fingerprint on it. Hamilton testified that the defendant called Patton. Patton went to a gas station and a Walmart, et cetera, et cetera. On the question of whether it's intentional, isn't under SEBI, he said that, you know, even with the coroner's report and the comforter and all of those things and that testimony, is that enough to get to intentional? I think the totality of the evidence certainly is enough. As I think Justice Holder-White might have mentioned, the fact that he went to such extremes to cover up this murder is certainly indicative of intent. We have him on video just two hours after the time of the murder. Under this prejudice standard, though, we are talking about whether or not if there's error, we have to show what the prejudice was. And if we look at, you know, closeness of the evidence and we have the defendant saying it was not intentional and Mr. Carroll saying or Mr. Hamilton saying it was intentional, isn't that just a credibility contest between those two individuals? Well, Your Honor, I would clarify. Hamilton, in fact, doesn't say it was intentional. Obviously, Hamilton wasn't there, so he only knows what the defendant told him. Hamilton says that the defendant said they were joking around. But we also know from a portion of the videos that the defendant does not challenge. The first video, the very first thing he says is this preposterous story that he had been passed out due to low blood sugar at 6 a.m. And no, he says this before he knows that the detectives have the video of him at the Walmart at around 5.30. Before the detectives even know about that video, he gives this story that he was passed out at 6 a.m. while Barbara Rose is making breakfast for him and he wakes up and she's just gone. And then somehow a week later, her charred and dismembered remains wind up in the backseat of his mom's car with his fingerprint on the garbage bag. I go back to the point that two hours, around two hours after this murder most likely happened, he's on video walking out of the Walmart with the very tools he's going to use to dispose of her body with a smile on his face. I would urge, and the jury saw that video, and I would urge the court to look at the video. We've got testimony from Rhonda Crippen, his other girlfriend, who he then spent that night with. And Crippen testified that he was acting normally. They ate dinner, they watched movies. There's no reasonable probability that the jury would have found that this was accidental. This was an intentional murder and the evidence overwhelmingly established that. I will turn briefly to the deficiency problem because, again, he has to not only show prejudice, but that counsel made errors that were so serious that he essentially did not have the counsel that guaranteed him under the Sixth Amendment. On the Miranda question, Bergwies, the United States Supreme Court case in Bergwies v. Tompkins, makes clear that the indication must be unambiguous. The defendant must say something that unambiguously expresses a desire to cut off the questioning. And I think it's telling that every one of the cases that the defendant cites in his brief in support of the Miranda argument involved some variation of the defendant saying, I don't want to talk. Or I believe one of the cases was, I decided not to talk. The federal case that my friend discussed a few moments ago involved the defendant not only saying, and again this was a non-native English speaker, he said not only, I don't talk no more, but I don't want to talk. In the Cox case, which my friend mentions, the defendant there says, I don't want to answer questions. Here the defendant does not say anything, he doesn't obviously use those words, but he doesn't say anything that amounts to an I don't want to talk. He says, there ain't nothing further for us to talk about. It's at least reasonable to construe that as him expressing the point that, listen, if you guys already know I did it, this is pointless. It's pointless to keep going with the conversation. That's different than saying, I don't want to talk anymore. Or even, I don't have anything else to say. He says, there ain't nothing for us to talk about, meaning the conversation is pointless. Counsel, in many of the cases cited by opposing counsel, ultimately the defendant ends up making a confession. Yes. Of course, that didn't happen here. Does that matter? Is that something we should consider? Well, that certainly goes to prejudice. I mean, that's certainly relevant to the question of if counsel had made this argument, and if it had succeeded, and some of the whatever statements we're talking about had been thrown out, the fact that there is no confession weakens any argument that there's been a reasonable probability that the result of the trial would have changed. Again, basically, you know, after those supposed indications, there are, you know, the defendant makes comments about trying to explain away cut and stained carpeting in the bedroom. He does make additional denials that it was an accident, although he denied that there had been an accident before then. But again, yes, I do think that's important for the prejudice inquiry. But again, the question here is not whether there was a meritorious Miranda claim, but whether it was objectively unreasonable for counsel not to make that argument, whether it was so clear. And I think, again, the fact that he doesn't say anything similar to what is said in these cases that we all agree are unambiguous. I don't want to talk. I've decided not to talk. That goes to the question of whether it was just objectively unreasonable for counsel not to advance the arguments. On the other claims of ineffectiveness, whether or not some of the detective statements should have been redacted or whether there's a limiting instruction, I think it's important, too, to recognize that this is not a case where those arguments were made at trial and then the question for this court is whether or not those arguments have merit. The question is whether it was objectively unreasonable for counsel not to make the arguments. And I would note in the appellate court recognized, in particular with respect to the limiting instruction, the appellate court stated that before that court, the court defendant had conceded that there was no controlling case law from this court on the use of such instructions. In the PLA, on a direct report to pages 2 and 16 of the PLA, on page 16, the defendant tells this court in taking the case, no pattern jury instruction addresses this type of evidence, nor does Illinois case law. I think that that, to my mind, resolves the question of whether counsel was objectively unreasonable in not seeking to redact the videos or to request the limiting instruction. And I think the court can save for another day the closer question on the merits whether those actions would have succeeded if counsel had pursued them. I think, again, as far as the redactions and limiting instruction goes, as we talked about in the brief, there are also, I don't think the defendants overcome the strong presumption, that's Strickland's language, that counsel made these decisions in the exercise of trial strategy. Now, I absolutely concede that the main argument counsel put forward at trial was that the defendant had nothing to do with it, didn't do it at all. It doesn't mean that, you know, counsel can't sort of have multiple strategies. This was an extraordinarily difficult case for defense counsel to handle. As I said, the evidence was overwhelming. The odds that the jury was going to believe that the defendant had nothing to do with it are, frankly, I think it's telling that my friend today concedes that the evidence did establish that he dismembered, burned, cut up the barber's body. You know, I've gone through some of that evidence earlier. You know, the jury was going to find that he did all that. And so, you know, counsel didn't have a whole lot of options. And, you know, really what, in a lot of these cases, defense counsel's best tack is to sort of just sow whatever doubt you can. And so, you know, the main argument was, well, maybe, you know, there was some DNA evidence that showed an unknown profile. Well, maybe it was that person. But counsel does also say, you know, the state relies on Hamilton. And if you believe Hamilton, well, you know, this wasn't intentional. So there was that sort of secondary argument that was presented. And, you know, the fact that in the appellate court the defendant's argument was that the evidence was insufficient because the state didn't prove it was intentional. So clearly that was also an issue in the case. The people had to prove intent whether he argued accident or not. And so at the end of the day, I think it's hard to say that counsel's, you know, strategy here was unreasonable, that counsel, you know, made errors that were so serious she was not functioning as Sixth Amendment counsel. And for those reasons, we would urge the court to reject the ineffective assistance claim. If there are no further questions on that issue, I will briefly turn to the multiple convictions issue. And I think here it's also helpful to sort of step back because I think there's actually underlying dispute between the parties here. There is agreement on the unit of prosecution issue, I think. We both agree that the unit of prosecution under both the dismembering of human body statute and the concealment of a homicide or death statute is course of conduct. You know, we agree that a defendant can't be convicted of dismembering a human body, separate counts, for each limb that he cuts off or for each act of dismemberment that he commits, likewise under the concealment statute. So we agree that it criminalizes a course of conduct, a course of dismembering a human body, a course of concealment. The only question here is whether a defendant can ever commit separate courses of conduct when there's only one human body involved or one homicidal death concealed. And I think my friend makes a telling concession here that their argument would be the same even if this had been years later. So, for example, if defendant had dismembered Barbara Rose's body, hidden it away somewhere, and had not been caught. He'd gotten away with it. Twenty years later, the police reopened the investigation. Defendant hears on the news that they have a tip about where the body might be hidden, and he then goes and moves it again. To say that that would be considered the same course of conduct, even though it's the same homicidal death, or let's say at that point he incinerated the body, cremated it. To say that that was the same dismembering, I think, strains credulity. This court in People v. Coates noted the uncontroversial proposition that convictions for multiple counts of the same offense can sometimes be proper. There's the federal case, United States v. Maldonado Passage, which has a similar sort of issue there where a defendant asked two different people, offered to pay two different people to murder the same victim. And he was then convicted of two counts of murder for hire. He argued, well, there was only one victim I tried to murder, so that can only be one conviction. The court rejected that. And we cite the Colorado Supreme Court case. And we cite it because I think, frankly, it sort of states the principle memorably or sort of cogently. And they say that successive commissions of the same offense can be proper, even when the unit of prosecution is a course of conduct. So the issue here is whether or not the defendant's multiple acts can be divided into separate courses of conduct. And if you look at these six factors that we discussed, which this court applied in a similar context in Sinkowitz, there it was a double jeopardy claim. And the question was whether or not there were multiple acts that could support two different offenses. Excuse me, two different offenses. But the question is the same. Were there discrete courses of conduct? And I think it's we have an unusual case here because I think, you know, it's not going to be often that the state will be able to prove that we have multiple discrete courses of dismembering a human body or discrete courses of concealing a homicidal death. But here I think the facts do show it. We have obviously burning and dismembering are dissimilar acts. Those acts were separated, according to Hamilton's testimony, by at least a day. And I think most critically they're separated by an intervening event, him talking with the police, which most likely triggered in him a fear that his initial attempts to hide the body and conceal the death weren't going to be enough. It should have been obvious to him after that first interview with police on the October 26th that he was a suspect here. And after that, he goes back and then cuts up the body. And we know what happened after that because in the car with some of Barbara Rose's remains, police found a piece of cloth that, you know, strikingly similar pattern on it to the shirt that the defendant was wearing at the October 26th police interview. So I think the evidence here did establish that there was that intervening event there. On the Apprendi question, I agree that most likely that was something that would have to be proved to the jury under Apprendi and Erlinger. But Apprendi is subject to harmless error. In this case, it would be plain error. The defendant never made an Apprendi argument below, didn't request a jury instruction on that. And whether we look at it under a plain error test or a harmless error test, the evidence here clearly establishes that these were discrete courses of conduct and that the separate convictions were therefore proper. So if there are no further questions on that issue, again, as we mentioned in the brief, we do agree that only two of the concealment convictions are proper. There was only two discrete courses of conduct that the evidence establishes. So we would agree that the court should vacate one of the concealment convictions, but we ask the court to affirm the other two concealment convictions, the two dismemberment convictions, and, of course, the murder conviction. Thank you. Thank you, counsel. Counsel? Counsel to reply? Thank you, Your Honors. I would like to first just briefly touch on the state's reliance on this United States Supreme Court case in PRIMO. That case was a federal habeas case where the court was having to go through standards of deference. And in another case cited by the state, this Harrington v. Richter case, the court explained very thoroughly. Both of these cases were issued on the same day, I should point out, PRIMO and Richter, that when you get to federal cases, first the defendant has to pass Strickland. Then he has to show that no reasonable-minded jurist would have reached a different decision. So PRIMO doesn't set out to change any of the standards of Strickland. And the law is what this court has always said. If a motion is suppressed, it would be was there a reasonable chance for that motion to succeed. That's also the PRIMO case cites to another case, Kimmelman, I think is the name of the case, that reiterates that standard. So the usual rules of Strickland apply. And by any standard, it was professionally unreasonable for counsel not to move to suppress, move to redact, and get the limiting instruction for all the reasons I've stated already. The state talks about how Hamilton is this beacon of truth who knows things that he couldn't possibly know if Keyes hadn't talked to him. Also, Hamilton is wrong on some things. He says that Keyes tells him that he holds Barbara Rose until he hears her heartbeat stop, and that takes 30 minutes. The medical examiner testified and said it would have been she would have died within minutes. So there are issues with Hamilton's testimony that the jury had to grapple with where we're looking at reasonable confidence in a different outcome, a reasonable probability of a different outcome. We have to look at the fact that the jury was also given statements from police officers that Keyes not confessing to them proved he did this intentionally. And there was a second fingerprint on the bag. There was all of this. And again, if we're going to say that all of these actions after the fact proved guilt, then again, Nick Patton is right there with him. So the state talks about this smile on his face when he's coming out of Walmart. There are so many reasons why he could have been smiling at that moment. If we're going to say that is what made the jury find him guilty of intentional murder rather than police officers without any limiting instructions, saying in their interrogation video, you not telling us that this is an accident proves it was intentional, then I don't know. I think police officers are more compelling. Certainly, when we're looking at reasonable probability, not was the evidence sufficient to convict, there was a reasonable probability here. And certainly, even more, if you think Keyes was involved, there was literally no direct evidence that Keyes did this intentionally. The only direct evidence, Hamilton's testimony, provided a scenario where it was an accident. And we have, though, on the other hand, police again saying in the interrogation video, you did this in your cold-blooded murder. I've certainly always conceded that there is no specific Illinois pattern during the instruction that talks about this type of evidence. There is no Illinois pattern during instruction that talks about hearsay at all. I don't think we all understand. Courts have always said if you get hearsay, you get any evidence. Rule 105 says that any evidence that comes in for a limited purpose, you instruct the jury. All the other state cases matter is how that instruction would have looked. The state also talks about how counsel may have wanted a strategy for the court to, strategy for counsel to hear this alternative theory of an accident during the interrogation video. Since she mentioned at trial that even if you believe the state witnesses, I want to say counsel's arguments were 30 pages. 29 of them are Keyes didn't do this. At one point she says, even if you do believe Carol Hamilton, that doesn't prove murder. Fine. Let's say counsel wanted that in. She has stuff before the invocation where they talk about Nick says this was an accident. You know what happens after the invocation? The police repeatedly saying we don't believe Nick. We believe, we don't believe like Nick does that this was an accident. So there was absolutely no way that counsel could have wanted all that stuff to come in and wanted the jury to hear the police repeatedly discredit Keyes' story and tell them they don't believe him. With respect to the invocation issue, the state talks about how he didn't say I don't want to talk. I don't want to do things like that. There is another case that we cited, People v. Ward, where the statement is more similar and he uses the word ain't. I ain't got nothing else to say. So when you look at that, plus the other cases we cited that talk about how this wasn't a contingency, you also factor in the police left five minutes later. They ask him all these clarifying questions. He confirms he doesn't want to talk. We certainly got enough here. There really can be no one denying it. And the state has not pointed to one case that says that this wasn't enough here. With respect to the one act, one crime stuff, I would talk about it's going to be a very rare circumstance indeed where it's 20 years later or five years later on the news this is coming out. And it's something that's a different course of conduct that the state talks about. In that case, fine. If the state wants to litigate something about whether this might be a separate course of conduct, first of all, it has to go to the jury to make that determination. Again, as the state concedes that's not happened here, so this isn't a chance to do that. I also think when we're applying the rule of lenity, which we have to do at this point under this case where it wasn't years, it was days, the legislature has not said this is okay. So if the legislature wants to change that in the future to say an act separated by years is something, that's fine. But also let's consider the fact that when they were debating this statute, they said we don't want this penalty to be ratcheted up near first or second degree murder. Dismemberment is a class X conviction with a penalty range of six to 30 years. So someone who does this years later, who's not causing any separate harm, but it's already been concealed, it might aggravate the closure to the family, they can get a 30-year sentence. There is a wide range of penalty for someone who does this over and over and over again. I would just like to say the state references codes and says that multiple convictions are sometimes improper. That's a one act, one crime case. There is no dispute that multiple convictions can sometimes be improper. And with respect to Sienkiewicz, there was not an issue of whether it was a course of conduct. The specific case, the specific issue was did multiple acts occur to support multiple convictions? And the court said no, they did not. And so when we're looking to figure out what constitutes the course of conduct, Bell is the accurate case. And Bell says an unrelated course of conduct is one in which there is a change in the nature of the defendant's criminal objective. And here there was no such change. The one final thing I would like to say is defense counsel definitely preserved this error. She filed a motion both before sentencing and after sentencing. She said there could only be one conviction under each statute. And she actually used the words course of conduct, to be honest. It was the state who came back and said course of conduct doesn't matter. So defense counsel definitely preserved this issue. It is right for this court's review and appeal. And we would ask this court to reverse all but one, each conviction of dismemberment and concealment, and to grant Keyes a new trial on the murder charge. Thank you, counsel. This case, agenda number two, number 130110, people versus the city of Illinois versus Keyes, will be taken under advisement. Thank you both very much for your arguments.